UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BINDER SCIENCE, LLC; THOMAS WENTZLER, | |
| Plaintiffs, | |
| -against- | Civ. A. No.: |
| OPAL FUNDING GROUP LLC; SLATE ADVANCE LLC; MENACHEM MOSHE RIVLIN A/K/A MOE RIVS; YECHIEL REUVEN RIVLIN; THE JCT GROUP LLC; JONATHAN CASALI; and JEYMARA REYES | |
| Defendants. | |

## COMPLAINT

Plaintiffs, Binder Science LLC ("Binder Science") and Thomas Wentzler ("Mr. Wentzler") allege against Defendants, Opal Funding Group LLC ("Opal"), Slate Advance LLC ("Slate Advance"), Menachem Moshe Rivlin a/k/a Moe Rivs ("Moshe Rivlin"), Yechiel Reuven Rivlin ("Yechiel Rivlin"), The JCT Group LLC ("JCT Group"), Jonathan Casali ("Mr. Casali") and Jeymara Reyes ("Ms. Reyes") as follows:

## NATURE OF THE ACTION

1.      This is a Fraudulent Inducement, Conspiracy to Commit Fraud, Breach of Contract (in the alternative), RICO, and Conspiracy to Commit a Violation of RICO action against Opal, its owners, Yechiel Rivlin and Moe Rivlin, Slate Advance, JCT Group and its owner, Mr. Casali (collectively "Defendants").

2.      Plaintiffs are victims of a fraudulent and deceptive financial scheme employed by, Yechiel and Moe Rivlin (collectively, the "Rivlins"), through their shell entity Opal Funding Group, along with co-conspirators Slate Advance, JCT Group, Mr. Casali, and Ms. Reyes to take advantage of a financially desperate, elderly man who was under extreme financial duress to keep the business he founded alive.

3.      Plaintiffs are victims of "carroting."

4.      "Carroting" is a fraudulent practice used by Merchant Cash Advance ("MCA") companies and brokers to bait desperate business owners into taking out predatory MCA loans based on the false promise that paying off the MCA company can provide immediate funding for large amount of money, with no intention of actually funding loans.

5.      In reality, these MCA companies "carrot" these loans to desperate business owners in order to receive a large broker fee.

6.      After baiting these desperate business owners into taking out an exorbitantly high-interest MCA loan, the broker making these promises "ghosts" the business owner and leaves them in a far worse financial condition than they were before the scam.

7.      For their roles in this fraudulent and deceptive scheme, the broker receives a massive commission based on the size of the MCA loan.

8.      These "carroting" schemes have become the focus of several federal and state investigations, including most recently in the New Jersey.

9.      In *U.S. v. Rosenthal et al.,* Mag. No. 25-15092 (D.N.J. April 11, 2025), the federal government filed a criminal complaint against eight defendants with a very similar fact pattern to one at hand here.

10.     The complaint stated in part:

> [t]he Defendants targeted victims across the United States, including but not limited to victims residing in New Jersey. Through misrepresentations and falsehoods, the Defendants promised these victims that in exchange for money provided upfront, the Defendants would ultimately extend a loan or line of credit to the victims. Once a victim provided the upfront payment to the Defendants, the Defendants did not extend a loan or line of credit to the

victim. Instead, the Defendants kept the victims' money and broke off communication."

Exhibit A at ¶ 1.

11.     The complaint further states that "the Defendants identified and contacted small business owners whom they believed were interested in obtaining loans or line of credit for their businesses." *Id.* at ¶ 2

12.     It also states that "the Defendants kept the victim's money and broke off communication with the victim."

13.     The fraudulent and deceptive scheme by Defendants here is almost an exact replica of the scheme depicted in the *Rosenthal* complaint.

14.      First, the victim, who was almost eighty years old when first contacted by Rivlin, was preyed upon due to his previous MCA loans and the financial situation of the company he founded, which was on the verge of bankruptcy.

15.     Mr. Wentzler was grasping for any hope possible to keep his business and life's passion alive and away from bankruptcy.

16.     Defendants knew of the Plaintiffs' dire financial situation and extremely vulnerable position and used this to their advantage.

17.     Beginning in December 2023, Moshe Rivlin began to email Plaintiffs seemingly daily, urging them to enter into a MCA loan with Defendants.

18.     Defendants originally offered a $1 million loan.

19.     But once Defendants realized the dire financial situation Plaintiffs were in, they began offering even larger loans, up to even $30 million.

20.     While Plaintiffs had reservations concerning entering into an agreement with Defendants, Moshe Rivilin continued to pursue Plaintiffs.

21.     Moshe Rivlin used tactics such as stating that an agreement must be signed that day to ensure funding and even changing the recipient of a payment to himself, in an attempt to do anything he could to secure his outrageous commission and defraud Plaintiffs.

22.     Plaintiffs eventually signed three different MCA loan agreements with Slate Advance, that were brokered by Moshe Rivlin and verbally agreed to a fourth.

23.     Additionally, Plaintiffs signed a broker agreement with Opal.

24.     Moshe Rivlin brokered the MCA Agreements with Slate Advance, a notorious MCA lender.

25.     Plaintiffs' payment of $314,000 was made to JCT Group LLC, which is owned by Jonathan Casali.

26.     Despite the payment, Plaintiffs were never actually funded any money by any of the Defendants.

27.     Plaintiffs have been "ghosted" by all Defendants, not hearing from them in well over a year.

28.     It is against this backdrop that Plaintiffs file this Complaint.

## THE PARTIES

29.     Plaintiff, Binder Science, LLC, is a corporation duly organized under the laws of Texas, with its principal place of business located in Willis, Texas.

30.     Plaintiff, Thomas Wentzler, is an individual resident and citizen of Texas and Founder and CEO of Binder Science, LLC.

31.     Defendant, Opal Funding Group LLC, is a limited liability company organized and existing under the laws of the state of Florida. On information and belief, Opal Funding Group LLC has no legitimate place of business, no assets, and no employees. Rather, it is an empty shell

used by its owners, Defendant Menachem Moshe Rivlin a/k/a Moe Rivs and Yechiel Reuven Rivlin, to shelter their fraudulent business activities.

32.     Defendant Moshe Rivlin is a citizen and resident of Lakewood, New Jersey.

33.     Defendant Yechiel Rivlin is a citizen and resident of Lakewood, New Jersey.

34.     Defendant Slate Advance LLC is a limited liability company organized and existing under the laws of the state of New Jersey with its principal place of business located at 15 America Avenue, Suite 303, Lakewood, NJ 08701.

35.     Defendant The JCT Group LLC, is a limited liability company organized and existing under the laws of the state of Florida with its principal place of business located at 20200 West Dixie Highway, Suite 703, Aventura, Florida 33180. Defendant Jonathan Casali is the owner of The JCT Group LLC.

36.     Defendant Jonathan Casali is citizen and resident of Bronx, New York.

37.     Defendant Jeymara Reyes is a citizen and resident of Homestead, Florida.

## **JURISDICTION**

38.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the Plaintiffs and Defendants.

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

40.     Defendants are subject to the personal jurisdiction of this Court because at least one Defendant resides here, Defendants regularly transact business within the State of New York, and/or have purposefully availed themselves of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL BACKGROUND

**A.      Binder Science's Business.**

41.     Binder Science, founded in 2008, is a manufacturer of proprietary chemical products for the upstream oil and gas industry.

**B.      First MCA Loan Agreement**

42.     The first agreement made between Tom and Slate Advance, brokered by Opal, was on January 10, 2024 for an amount of $5,500,000 ("First Slate Advance Agreement"). *See* Exhibit B.

43.     While the loan was supposed to be for $5,500,000, Slate Advance only agreed to fund $4,950,000, with Moshe Rivlin receiving a commission of $550,000 to allegedly "cover underwriting and the ACH debit program, as well as related expenses." *Id.* at § (2)(A).

44.     Page 1 of the First Slate Advance Agreement called for Plaintiffs to make monthly payments in the amount of $131,521 for the "Receivables Purchased Amount", which was purported to total $6,050,000. *Id.* at pg. 1

45.     Page 23 of the First Slate Advance Agreement states that there will be 47 equal monthly payments of $131,521. *Id.* at pg. 23

46.     However, when you perform the calculation of 47 monthly payments of $131,251, the amount owed by Plaintiffs was actually $6,181,487.

47.     Further, on top of the $6,181,487, Plaintiffs were required to pay Slate Advance 25% of their revenue, under the guise of a "Receivables Purchsed Amount", during the duration of the First Slate Advance Agreement.

48.     This would mean that the APR on the $6,050,000 loan had an APR of approximately 2.5% plus the 25% Receivable Purchased Amount, totaling an actual APR of approximately 27.5%.

49.      However, since Plaintiffs were only scheduled to be funded $4,950,000 the loan had an APR of approximately 5.67% plus the 25% "Receivable Purchased Amount", totaling an actual APR of 31.67%.

50.      Plaintiffs never received any of the money that was promised to them under the First Slate Advance Agreement.

**C.      Second Slate Advance Agreement**

51.      Despite never funding the First Slate Advance Agreement, Plaintiffs "carroted" a promise of a larger funding deal with a second agreement between Tom and Slate Advance.

52.      The second agreement made between Tom and Slate Advance, and brokered by Opal, was on January 22, 2024 for an alleged amount of $8,000,000 ("Second Slate Advance Agreement"). *See* Exhibit C.

53.      This loan was purportedly for more money than the First Slate Advance Agreement, but what Moshe Rivlin did not disclose was how much worse the terms were.

54.      While the loan was supposed to be for $8,000,000, Slate Advance only agreed to fund $7,520,000, with Moshe Rivlin receiving a commission of $480,000 to allegedly "cover underwriting and the ACH debit program, as well as related expenses." *Id.* at § (2)(A).

55.      Page 1 of the Second Slate Advance Agreement called for Plaintiffs to make monthly payments in the amount of $266,804 for the "Receivables Purchased Amount", which was purported to total $9,200,000. *Id* at pg. 1.

56.      Page 26 of the First Slate Advance Agreement states that there will be 35 monthly payments of $266,804. *Id* at pg. 23.

57.      However, when you perform the calculation of 35 monthly payments of $266,804, the amount owed by Plaintiffs was actually $9,338,140.

58.     Further, on top of the $9,338,140, Plaintiffs were required to pay Slate Advance 25% of its revenue, under the guise of a "Receivables Purchsed Amount", during the duration of the Second Slate Advance Agreement.

59.     This would mean that the APR on the $8,000,000 loan had an APR of 11.15% plus the 25% "Receivable Purchased Amount", totaling an actual APR of 36.15%

60.     However, since Plaintiffs were only scheduled to be funded $7,520,000, the loan had an APR of 16.14% plus the 25% "Receivable Purchased Amount", totaling an actual APR of 41.14%.

61.     Plaintiffs never received any of the money that was promised to them in the Second Slate Advance Agreement.

### D.     Opal Agreement

62.     On January 26, 2024, Moshe Rivlin on behalf of Opal, had Plaintiffs sign yet another Agreement.

63.     This time the agreement was directly with Opal. (the "Opal Agreement").

64.     The Opal Agreement was an "Independent Sales Organization Fee" Agreement between Plaintiffs and Opal that allowed for Mr. Rivlin to receive an extra fee for brokering agreements between Plaintiffs and MCAs companies. *See* Exhibit D.

65.     Once Opal brokered a deal with a MCA company, the Opal Agreement required Plaintiffs to send $100,000 to Opal 48 hours prior to the MCA providing funding to Plaintiffs.

66.     The Opal Agreement further required that Plaintiffs provide Opal a payment of $150,000 after Plaintiffs were funded with MCA loan.

### E.     Third Slate Advance Agreement

67.    On January 30, 2024, a mere eight days after the Second Slate Advance Agreement, Moshe Rivlin dangled another carrot and brokered another deal between Plaintiffs and Slate Advance with even more egregious terms.

68.    Plaintiffs signed an agreement dated January 30, 2024, purportedly in the amount of $5,000,000 (the "Third Slate Advance Agreement"). *See* Exhibit E at pg. 1.

69.    However, like the First and Second Slate Agreements, the Third Slate Advance Agreement funded less than the agreed upon amount to Plaintiffs since the commission paid to Moshe Rivlin was deducted from the loan amount.

70.    Under the Third Slate Advance Agreement, Plaintiffs would only receive $4,500,000 after the $500,000 commission was deducted. *Id.* at pg. 2.

71.    On the day the Third Slate Advance Agreement was signed, Moshe Rivlin informed Plaintiffs that he was "[g]oing to need the first payment upfront or I don't need a upfront if you can transfer $800,000 to chase or I need a wire for the first weekly payment upfront let me know what you want to do." *See* Exhibit F.

72.    Inexplicably, two hours later, he changed the required initial payment amount to $314,000. *See* Exhibit F.

73.    Plaintiffs then wired $314,000 to JCT Group that same day. *See* Exhibit G.

74.    Plaintiffs were obligated to make 24 equal monthly payments of $312,500, totaling $7,500,000.

75.    Further, on top of the $7,500,000, Plaintiffs were required to pay Slate Advance 25% of its revenue, under the guise of a "Receivables Purchsed Amount", during the duration of the March Agreement.

76.    This would mean that the APR on the $5,000,000 loan had an APR of 33.65% plus the 25% "Receivable Purchased Amount", totaling an actual APR of 58.65%

77.     However, since Plaintiffs were only scheduled to be funded $4,500,000, the loan had an APR of 45.22% plus the 25% "Receivable Purchased Amount", totaling an actual APR of 70.22%.

78.     On January 30, 2024, Moshe Rivlin stated that "I will start my debits for the first month and a half of $225,000 starting February 9th."

79.     The deposit never came.

**F.      March MCA Loan Agreement**

80.     Despite already defrauding Plaintiffs of $314,000, Defendants came knocking again.

81.     In mid-March 2024, Moshe Rivlin again reached out to Plaintiffs about funding up to $30 million ("March Agreement").

82.     This time, he had the backing of his father, Mr. Yechiel Rivlin.

83.     Moshe Rivlin promised to fund $10 million to Plaintiffs on or around March 15, 2024.

84.     However, after Moshe Rivlin changed the recipient of the funding to him at the last second, Tom stated his dissatisfaction with Moshe Rivlin's actions by stating "[y]ou screwed that up by changing the recipient to at the last moment." *See* Exhibit H.

85.     Moshe Rivlin responded by acknowledging that he changed the recipient of the funds to himself, stating "I know I screwed up by changing where it needs to be sent if you would have sent Friday you would had 10 million latest today from my dad and the other 20 million on the 27th when he flys down to you."

86.     Moshe Rivlin further implicated his father when he stated in the same email "please work with me I got my dad to explain it to you on Friday…"

87.     Upon Moshe Rivlin's instruction, Plaintiffs then wired $27,000 to Defendant Ms. Reyes on behalf of Moe Rivlin. *See* Exhibit I.

88.     After this, Plaintiffs ceased communications with Defendants.

## FIRST CAUSE OF ACTION
### (Fraudulent Inducement)
**(Against Opal Funding Group LLC, Slate Advance LLC, Menachem Moshe Rivlin a/k/a Moe Rivs, and Yechiel Reuven Rivlin)**

89.     Plaintiffs repeat and re-allege the allegations set forth above herein.

90.     Defendants' misrepresentations as set out above were made with the intent to induce Plaintiffs to enter into the various MCA funding agreements and to defraud them of at least $341,000.

91.     But for Defendants' misrepresentations, Plaintiffs would not have entered into the any of the Slate Advance Agreements, Opal Agreement, or the March Agreement (collectively the "Agreements").

92.     But for Defendants' misrepresentations, Plaintiffs would not have wired Defendants $341,000.

93.     Defendants knew that they were not going to provide any MCA funding to Plaintiffs and only indicated they were going to so that Plaintiffs would enter into the Agreements and provide Defendants with at least $341,000.

94.     Defendants' failure to disclose this material fact was misleading to Plaintiffs.

95.     Defendants had a duty to make full disclosure under applicable law.

96.     Plaintiffs were proximately and directly damaged due to Defendants' intentional misrepresentation and fraudulent scheme.

97.     Defendants are liable to Plaintiffs for their misrepresentations to Plaintiffs, with full damages to be determined at trial, but in no event less than $341,000.00 plus attorneys' fees and costs.

98.    Defendants' conduct was willful, wanton and outrageous, warranting punitive damages.

## SECOND CAUSE OF ACTION
### (Conspiracy to Commit Fraud)

99.    Plaintiffs repeat and re-allege the allegations set forth herein.

100.    Defendants, knowingly and willfully conspired and agreed among themselves to defraud Plaintiffs through a coordinated fraudulent "carroting" scheme.

101.    In furtherance of this conspiracy, Defendants misrepresented and concealed material facts concerning the nature of the Agreements, the existence of promised funding, and the use of upfront payments wired by Plaintiffs.

102.    Defendants made these misrepresentations and omissions with the intent that Plaintiffs would rely upon them in entering into the Agreements, paying excessive upfront fees and commissions, and wiring hundreds of thousands of dollars to Defendants.

103.    Plaintiffs justifiably relied on Defendants' representations and Agreements, believing that substantial funding would be provided to salvage Binder Science's fledging business operations.

104.    As a direct and proximate result of Defendants' conspiracy to commit fraud, Plaintiffs suffered damages, including but not limited to:

    a.    The loss of at least $314,000 wired to JCT Group;

    b.    The loss of $27,000 wired to Ms. Reyes on behalf of Moshe Rivlin;

    c.    Out-of-pocket expenses, lost business opportunities, and reputational harm; and

    d.    Severe financial distress to both Mr. Wentzler personally and Binder Science's business.

105.    Defendants' conduct was intentional, willful, malicious, and undertaken with reckless disregard for Plaintiffs' rights, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of Contract in the Alternative)**

106.    Plaintiffs repeat and reallege the allegations of each of the foregoing paragraphs.

107.    Plaintiffs and Defendants entered into valid and enforceable agreements, including the following:

    a.    First Slate Advance Agreement (January 10, 2024)

    b.    Second Slate Advance Agreement (January 22, 2024)

    c.    Opal Agreement (January 26, 2024)

    d.    Third Slate Advance Agreement (January 30, 2024)

    e.    March Agreement (March 2024)

108.    Under these Agreements, Defendants promised to provide Plaintiffs with tens of millions of dollars in MCA funding in exchange for payments, commissions, and various upfront fees.

109.    Plaintiffs fully performed their obligations under the Agreements by executing the contracts, wiring the required funds, and otherwise complying with Defendants' stated terms.

110.    Defendants materially breached the agreements by failing to provide any of the promised funding to Plaintiffs, despite retaining Plaintiffs' payments and broker fees.

111.    As a direct and proximate result of Defendants' breaches, Plaintiffs suffered damages including but not limited to

    a.    The loss of at least $314,000 wired to JCT Group;

    b.    The loss of $27,000 wired to Ms. Reyes on behalf of Moshe Rivlin;

    c.    Out-of-pocket expenses, lost business opportunities, and reputational harm; and

    d.   Severe financial distress to both Mr. Wentzler personally and Binder Science's business.

112.    Plaintiffs are entitled to recover compensatory damages in amount to be determined at trial, but in no event less than $341,000.00 plus attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**(Declaratory Judgment)**

113.    Plaintiffs repeat and reallege the allegations of each of the foregoing paragraphs.

114.    Plaintiffs seek a declaratory judgment that the three Slate Advance Agreements and March Agreement (collectively the "MCA Agreements") are unenforceable as a matter of law because they are unconscionable and violate the usury laws of New York.

115.    The MCA Agreements subject to the usury laws of New York.

116.    New York's civil usury law prohibits loans in excess of 16%. *See* NY GOL § 5-501.

117.    New York's criminal usury law prohibits loans in excess of 25%. *See* NY Penal Laws § 190.40.

118.    The annual interest rate for the Agreements range from 27% to over 70%.

119.    The MCA Agreements violate New York usury laws.

120.    The MCA Agreements are also unconscionable because (1) they state the interest rate in a deceptive manner and fail to disclose the true interest rate; (ii) the Agreement is a contract of adhesion; (iii) Plaintiffs had no opportunity to negotiate any terms; (iv) the Agreement was presented as a take it or leave it proposition; (v) Plaintiffs had no opportunity to be represented by counsel with respect to the Loan; and (vi) Plaintiffs had inferior bargaining power due to their financial desperation.

121.    The Loan should be declared unenforceable as a matter of law.

**FIFTH CAUSE OF ACTION**
**(Violation of RICO 18 U.S.C. § 1962)**

122.    More than a dozen states, including New York and New Jersey, place limits on the amount of interest that can be charged for a loan.

123.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

124.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation titled "An Investigation of the Loan-Shark Racket" (the "Report"), brought to the attention of the Governor and the public the need for changes in the law.

125.    As a result of the Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans with an interest rate greater than twenty-five percent per annum.

126.    This measure was deemed vital in curbing loan-shark racketeering activity, and the Legislature created the crime of "criminal usury".

127.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**A.  Culpable Persons**

128.    Defendants Moshe Rivlin, Yechiel Reuven Rivlin, Jonathan Casali, and Jeymara Reyes (collectively the "Individual Defendants") are "persons" within the meaning of 18 U.S.C. § 1962(c) in that each are an individual capable of holding a legal interest in property.

129.    At all relevant times, Individual Defendants were persons who exist separate and distinct from the RICO Enterprise, described below.

**B.  The Distinct Roles in the Enterprise**

130.    All Defendants engaged in an enterprise ("Enterprise") that has a common goal of issuing loans with unconscionable and draconian terms in order to collect as much cash as the borrower has available, and then acquiring a security interest in the revenues the borrower generates with its underlying business operations until the usurious loan is paid in full.

131.    The members of the Enterprise have and had ongoing relations with each other through one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting unlawful loans issued by the Enterprise to small businesses throughout the United States, including Plaintiffs

132.    The debt arising under the MCA Agreements, constitute an unlawful debt within the meaning of 18 U.S.C. § 1962(6) because: (i) they violate applicable criminal usury statutes and; (ii) the interest rate is more than twice the legal rate.

133.    Here, the MCA Agreements charge an effective interest rate ranging from 27% to in excess of 70% per annum, which is more than twice the New York criminal rates of 25% and 50%.

134.    The MCA Agreements violate New York criminal law:

135.    A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period. *See* N.Y. Pen. 190.40.

**D.**    **Moshe Rivlin Controls the Enterprise**

136.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.

137.    Moshe Rivlin and Yechiel Rivlin, are the founders and owners of Opal.

138.    At all times relevant, the Rivlins, as owners, were responsible for creating, approving, and implementing the policies, practice and instrumentalities used by the Enterprise to accomplish its common goals and purposes including *inter alia*: (i) the borrowers to whom the Enterprise lends funds; (ii) the form of the loan agreements used; (iii) the amount and repayment period of the usurious loans extended by the Enterprise to borrowers; and (iv) the method of collecting the payments via ACH withdrawals. All such policies, practice and instrumentalities were used to make and collect upon the unlawful loans including, without limitation, the loan extended to Plaintiffs here.

139.    Through their operation of the Enterprise, the Rivlins furthered the unlawful objectives of the Enterprise, including but not limited to, entering into financing agreements and collecting and/or attempting to collect unlawful debts, including through the making of loans to small businesses through banks located in states that have less strict usury laws, such as in this case.

140.    Through their positions as founders and owners, the Rivlins are active participants and the two central people in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debt.

141.    Through their positions, the Rivlins have taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including directing members of the Enterprise to make loans to merchants in dire need, to fund only certain amounts of those loans, to set interest rates at exorbitant rates, and to have a security interest in the revenues generated by the small businesses.

142.    The Rivlins have an ownership interest in, and exercises control over, the Enterprise.

143.    Through salary, bonus, profits or other distributions by Opal, the Rivlins have ultimately benefited from the Enterprise's collection of unlawful debts, and remains motivated to continue its unlawful objectives in pursuit of same.

### E.    Opal's Role in the Enterprise

144.    Opal maintains officers, books, and records separate from the other Enterprise Members.

145.    Opal is responsible for the day-to-day operations of the Enterprise and, through the Rivlins, have final say on all business decisions of the Enterprise, including, without limitation, which loans will be funded, how such loans will be funded, which investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the Loans extended to Plaintiffs.

146.    Opal is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of loan agreements used by the Enterprise to attempt to disguise Opal's role as the true lender; (ii) the method of collecting the monthly payments via ACH withdrawals; and (iii) the collection tactics used when a merchant is unable to pay. All such forms and collection tactics were used to make and collect upon the unlawful loans including, without limitation, the loan extended to Plaintiffs.

147.    Opal has ultimately benefitted from the Enterprise's activities through collecting brokerage fees from the borrowers, including Plaintiffs, and seeking to obtain a security interest to Plaintiffs' revenues.

### F.    Slate Advance and JCT Group

148.    Slate Advance and JCT Group maintain officers, books, records, and bank accounts independent of the other Enterprise Members.

149.    Slate Advance and JCT Group have been an active participant and complicit person in the operation of the Enterprise and its affairs and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts. Slate Advance and JCT Group continue to be responsible for: (i) being the contracting party and/or recipient of broker fees; and (ii) upon Opal's instructions, placing a security interest in the revenue that Binder Science generates.

**G.    Interstate Commerce**

150.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

151.    Specifically, the members of the Enterprise maintain or maintained offices in New York, New Jersey, and Florida and use personnel in these offices to originate, underwrite, fund, service and collect on loans made by the Enterprise to borrowers throughout the United States via the extensive use of interstate emails, telephone calls, wire transfers, bank withdrawals processed electronically though an automated clearing house, and mailing of checks.

152.    In the present case, communications between the Enterprise and Plaintiffs were by interstate telephone calls, wire transfer or wire communications, mail and/or email. Specifically, the Enterprise used interstate emails and telephone calls to originate, underwrite, service, and collect upon the loan agreements, fund the advances under the loan agreements and collect the payments, via electronic interstate withdrawals processed through an automated clearinghouse and/or by bank wire.

**H.    Issuance and Collection of an Unlawful Debt**

153.    The Loan Agreements with Plaintiffs constitutes an unlawful debt within the meaning of 18 U.S.C. §1962(c).

154.    Through the Enterprise, Defendants jointly and independently took actions to collect upon the unlawful debt, including bringing legal proceedings against Plaintiffs.

I.    **Injury**

155.    As a direct and proximate cause of Defendants' violation of 18 U.S.C. §1962(c), Plaintiffs have suffered, and continue to suffer, substantial injury to their business and/or property as Plaintiffs have been forced to pay unlawful, usurious interest, to incur legal fees to discharge the unlawful debt, and have been forced to cease doing business as a result.

156.    Pursuant to 18 U.S.C. §1962(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SIXTH CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

157.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

158.    By and through Defendants' business relationship with one another, their close coordination with one another in the affairs of the Enterprise, and frequent communications among them concerning the underwriting funding, servicing and collection of the unlawful loans, Defendants knew the nature and extent of the Enterprise. Through the same connections and coordination, Defendants knew that the other was engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. §1962(c).

159.    Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operations of the Enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreements, in violation of 18 U.S.C. 1962(c). In particular, Defendants were knowing, willing, and active participants in the Enterprise and its affairs, and the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts through Opal, Slate Advance, and JCT Group.

160.    The participation and agreement of Defendants was necessary to allow the commission of this scheme, as Opal could not have entered into the usurious loans without the use

of the Slate Advance and JCT Group vehicles.

161.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulted from the continuous violation of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected brokerage fees and loan payments.

162.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with defending themselves.

163.    Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an Order:

a)    Awarding compensation, direct, consequential damages, treble, and punitive damages including prejudgment interest, in an amount no less than $341,000

b)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and,

c)    Any further relief deemed appropriate by the Court.

Dated: October 20, 2025

**HESKIN & PROPER, PLLC**

By: _____

Shane R. Heskin
800 Westchester Ave., Suite 641N
Rye Brooke, New York 10573
(917) 362-1313
shane@heskinproper.com
*Attorney for Plaintiffs*